Judge Mills
delivered the opinion of the Court.
David and Levi M’Murtry being seized in fee of a tract of land, containing aboui sixty-five acres, in the year 1810, contracted by parol only, to sell it to Lewis Sanders., who paid them part of the price. But the whole price was not paid till the 27th of June, 1815, when they sealed and acknowledged a conveyance for the same, which was duly recorded forthwith. The deed hears date on its face, on the 28th of November, 1814, hut the acknowledgement, 27th June, 1815, when, as is, contended by the complainants in this controversy, it was first signed, sealed and delivered, and parol proof is adduced, to show that ¡such was the fact.
Sanders, to secure sundry debts due to the late Kentucky Insurance Company, conveyed a part of the same land, together with an adjoining piece, to ^ames Haggin and Thomas T. Crittenden, in trust, to secure the payment of these debts, with a full power to sell in default of payment. This conveyanee, in the body of it, bears date on the 16th February, 1814, and concludes thus: “In testimony whereof, the parties have hereunto set their hands and affixed their seals, this 16th day of February, 1815,” and then follows the seals and signatures of the parties. On the 28th of March, 1815, this deed was duly acknowledged and recorded in the proper office.
On the 15th of June, 1815, Sanders, to secure sundry debts, due by him to the Bank of Kentucky, conveyed sundry tracts of land to said Bank, and among the rest, the aforesaid tract conveyed to him by M’Mnrtry, and interfering with and extending into the first aforesaid tract, conveyed to the Insur *427 anee Company, to the extent of about thirty acres, and this collision between these two deeds has given rise to the present controversy, as that interference is the matter of dispute. This deed to the Bank of Kentucky, was not acknowledged and recorded till the 29th of October, 1817, upwards of two years after its date.
Scott, Morrison’s devisee’s claim, derived under the conveyance, for, the benefit of the Insurance Company.,
Caldwell’s claim derived under the deed of trust, to secure his debt to the Bank of Kentucky.
From this clashing of conveyances, arose two different claimants from the two banks down t.o the present parties. Haggin and Crittenden, the trustees for the insurance Company, sold and conveyed to James Prentiss, by deed dated the 24th of November, 1817; Prentiss conveyed in trust to Pearson, Scott and January; who sold and conveyed to James Morrison; who devised the tract, to Robert, Scott, who is a defendant in this suit.
On the other hand, the Bank of Kentucky, proceeded to foreclose her mortgage, on all the large estate conveyed to her by Sanders, including this thirty acres among the rest; and sold it and became-herself the purchaser. But this sale did not nearly discharge the debt of Sanders to the bank, and there were a number of collateral sureties bound to the bank for the debt of Sanders, who were much dissatisfied with this sale of the hank under its mortgage, and who prevailed with the bank, again to set up the same estate at auction, in order that they might attend to the sale, and cause it to bring a' better price, they, engaging to make up and pay the deficit, as Sanders had; failed. In the meantime, executions of others had been levied on this estate, so conveyed to the Bank of Kentucky, and the estate had been sold thereby, and James. Haggin had become the purchaser of part,, and James Cowan of another part, to whom the sheriff conveyed. This title was supposed to be dangerous to the title of the Bank of Kentucky, because the mortgage to the bank from ' Sanders, had not' been recorded in time, whereby the estate was believed to be- liable-to the judgments and executions of creditors. In order to obviate this difficulty, and to cause the estate in this second sale to bring as much as possible, by removing incumbrances, it was agreed between *428 tbe bank and these collateral sureties, that the bank s]10ll]¿ purchase in the title of Haggin and Cowan, acquired by the sheriff’s sale, before the estate was This was accordingly done, and the Bank of Kentucky again set up the estate, for the benefit of these sureties, at auction. At this sale, Caldwell, the present complainant, became the purchaser of a tract, which included this thirty acres, the matter of controversy, then claimed and held in the possession of Morrison. Caldwell accordingly gave bond with surety to the bank for the purchase money, and received a conveyance.
Alleo-ationsof Caldwell’s the Banket Kentucky0 and Mqrri" son-
Caldwell then filed this bill, making the Bank of Kentucky, and Morrison, in his life time, defendants; complaining, first against the bank, that theconveyancc which they had given him was not valid, because it was made by an agent of the bank, and had not the corporate seal affixed thereto; that it did not contain such clauses of general warranty as it ought to have done under the terms of sale, and that the bank had never given him possession, but Morrison still held possession of this thirty acres. As against Morrison, he alleges that the conveyance from M’Murtry to Sanders, was anti-dated, and that Sanders of course had no title when he conveyed to the Insurance Company, under which he held, and of course that Company took no title. That the conveyance to the Insurance Company, was dated a year before.it was recorded, and of course is was invalid as to creditors, and subsequent purchasers without notice, and that the Bank of Kentucky, under which he claimed, was such purchaser without notice. Or if the Bank of Kentucky got no title, and her conveyance was not recorded in time, then the executions of the other creditors took the estate, and Haggin, the purchaser, under them, acquired a good title, and the Bank of Kentucky having acquired this title before his purchase, of course their title was superior to Morrison’s. He prays that the bank may complete bis title, by making it as it ought to be, and that Morrison may be compelled to release his title, and to surrender the possession and account for the rents and profits, or if this prayer should not be granted, that he may *429 have relief granted him against the hank to the extent of the purchase money for the thirty acres.
Answer of the Bank of Ky.
Answer oí Morrison.
The bank answered, alleging that the conveyance received by the complainant, was received by him without objection, and his notes given for the purchase money; that they were however, willing to make him a conveyance with the seal properly annexed, if it was not already done, so soon as he would present to them a proper deed. They deny that they were to make any warranty by the terms of sale, but only to convey their title. That they were not to deliver possession, that the complainant knew of Morrison’s title; before he purchased, as Morrison proclaimed it at the sale, and particularly advised the complainant not to buy the thirty acres, as he, Morrison, would contend for it. That the sale was not for their benefit, nor were they interested in it, but that it was merely for the benefit of "the collateral sureties of Sanders.
Morrison having departed this life, his executor and devisee responded to the suit. The executor alone answered the original bill, setting forth the title of. the testator as we have already recited it. He denies any fraud in the deed from Sanders to the Insurance Company, and insists that the last date at the bottom is the true date; that the date in the body of the conveyance, was owing to the conveyance having been prepared before it was executed, or by a mistake pf the writer who had put in the old year, instead of the new, as frequently happened at the commencement of a new year, as this date was, and that the date at the bottom is the proper corrective. He insists that it is incompetent for Sanders or the M’Murtries, or any person claiming under them, to contradict or disprove the date of the conveyance from M’Murtries to Sat - ders, as the conveyance was recorded in due time; or if it is, that there was the same absence of title in Sanders, when he conveyed to the Bank of Kentucky, that there was when he conveyed to the Insurance Company, and that as tiie former war. not recorded in due time, Morrison had the superior equity; and that the conveyance of M’Murlry vdtoii *430 made, enured to the benefit of the trustees of the Insurance Company, and therefore, Haggin could not acquire title by the sheriff’s deed.
Caldwell’s ainendcd bill.
Agreement between Morrison and the other sureties of Prentiss, on the one part, and the Bank of Ky. on the other, for the re-sale of the property conveyed in pledge by Prentiss.
The complainant then filed an amended bill setting up additional and new equity against the title of Morrison, He charges that Morrison was one of the collateral sureties for Saunders, and was party to the arrangement and agreement made between said sureties and the bank, in pursuance of which, the estate mortgaged by Saunders to the bank, was brought into a market a second time. That that agreement was in writing, and signed by Morrison for himself and by James Haggin for the other sureties, and is to this effect:
“It is agreed between the Bank of Kentucky and James Morrison and others, collateral securities for Lewis Sanders, as followeth, to-wit:
1. The bank will pay Haggin and Cowan the a~ mount of their purchase money, at the sale of the property embraced in the deed of trust made by tlx sheriff to them respectively, with interest.
2. The collaterals will obtain a relinquishment or conveyance from Haggin and Cowan respectively, to the bank, of their right as acquired at such sale.
3. The bank shall sell, at as early a day as convenient, after the 10th day of July next, the estate conveyed by those deeds of trust as aforesaid, upon a credit of one, two and three years, equal instalments, payable in notes on this institution, or of the Commonwealth, agreeable to the provisions of the deeds.
4. The amount of the sales so made shall be credited upon the two notes, one of 024,000, the other of 026,000, in proportion to their original amount, as though paid when those notes were protested.
5. The collaterals jointly, or severally, or some of them, will secure to the hank the balance of the original amount of those notes, with interest on such balance, from the date of protest, payable in one, two and three years from the date of the 16th of July, by notes of that amount, with interest, with *431 security, or a lien on property satisfactory to the bank.
Advertiscment of the second sale and approbation thereof, by Morrison, set up against the claim he then held.
- 6. Those so securing the institution, shall be permitted, at their own cost, to prosecute for their own benefit, the ¿endorsers of Sanders upon the notes aforesaid, and the obligations of any collaterals who may prove delinquent without responsibility on the part of the bank, upon any event.
7. The President and Cashier of the Lexington branch bank and Benjamin Gratz, are authorized on the part of the bank, forthwith to consummate this arrangement, by receiving notes and securities from the collaterals giving, a receipt of the terms on which they are to be held, passing an order for the cancelment of the bonds of the collaterals, who shall comply with the terms aforesaid, receiving the relinquishment or conveyance of Haggin and Cowan and paying the amount of purchases aforesaid. The arrangement, so far as respects the matters previous to the sale, shall be fulfilled within fifteen days from this date or time. It is understood that the bank is not bound to sell to any, Avho shall not sufficiently secure the price.”
This agreement ivas signed by the officers of the bank, and by James Morrison and James Hag-gin, on behalf of the collaterals.
Also, to complete this arrangement, the officers of the bank drew up the form of a notice or advertisement of the contemplated sale, expressing on the face, “The Bank of Kentucky will convey the title invested in them by the trust, which is deemed unquestionable.” This form of advertisement was presented to Morrison and Haggin, who acted for themselves'and the other collateral sureties, audthey endorse on it as follows, subscribing their names thereto: “The within advertisement for the sale of property contemplated in the compromise between the Bank of Kentucky and the collateral sureties of Lewis Sanders, meets the wishes and views of the parties.” This endorsement, however, seems never to have been published with the advertisement. It is insisted, however, in the amended bill, that Mor *432 rison having entered into this arrangement, and remaining silent about his own claim to the thirty acres in contest, and uniting in imposing upon' the world a belief that the title was -good, cannot be permitted to claim or assert his title against a purchaser under that arrangement and sale, as the complainant is, and that he accordingly ought to be compelled to release.
Answer of Morrison’s executor and devisee, to Caldwell’s amended bill.
jOecreo of ¡.ho circuit court, dismissing the bill as to the Bank of Ky. but ordering Morrison’s representatives to reloase title and pay rents.
*432 To this the executor and devisee of Morrison answered, that although Morrison was a surety of Sanders, and party to this arrangement, and had been silent about his own title to the thirty acres, yet he ought not to be prejudiced by any of these acts, because he was ignorant at the time that the two conveyances of Sanders to the Insurance Company and the Bank of Kentucky, in any manner interferred, or that this piece of land, which he then claimed and held in possession, was in any manner covered by the deed to the Bank of Kentucky, and for this reason alone he was silent, and of course nothing was said about his claim to the thirty acres, nor was it merged in this agreement or excepted out of it. But that so soon as he discovered the interference, and that .this thirty acres was to be sold with an adjoining piece, he asserted and made public his title to all the purchasers, on the day of sale and particularly to the complainant and warned him not to purchase, and assured him that he, Morrison, would defend his title and possession at, law, to the utmost, and therefore the complainant could not claim to be a deluded purchaser by the acts of Morrison, nor could he claim that he expended his money under the connivance of Morrison, but that he was anxious for the land, and bought it at a risque, with a design to hold it by the force of his title.
The court below dismissed the bill as to the Bank of Kentucky; but decreed that the devisee of Morrison should release his title to the complainant and surrender the posseision of the land, and that the executor of Morrison should pay the rents thereof, since the purchase by the complainant.
From this decree the executor and devisee of Morrison have appealed.
Date at the conclusion of the deed of conveyance, exactly one year subsequent to that in the body of the instrument, held to be the true date of the execution of the deed.
Deed conveying the title to ono who had before, whilst he had no title,mado two deeds successively, to different persons, enures to the first grantee.
We shall first examine the claims of the parties as litigated in the original bill, and ascertain who held the real title at the time of this arrangement between the Bank of Kentucky and the sureties of Sanders. For it is evident that if either the bank, or James Haggin under the sheriff’s sale, then held the real title, the complainant must be invested with it, or the bank must be bound to make it .to him. On the contrary, if Morrison then held the estate, the question can then arise, how far he embarrassed it by this agreement. In determining this question much must depend on the conveyance from Sanders to the trustees of the Kentucky insurance Company, which was the first made by him. We cannot perceive any difficulty in the date of this deed. It is true that the date written in the body of the deed is exactly one year before the date written at the foot thereof, and as these dates disagree, one or the other must prevail as the true date. That written at the foot of the instrument is specially annexed as the day on which the deed was sealed, and taken in connexion with the acknowledgment of the deed, for the purpose of recording it, vve cannot hesitate to give it the preponderance over the date written in the body, which seems to have been, very probably, a mistake of the draftsman in the year in which he was writing. Giving this construction to the dates, as they appear on the instrument, this conveyance appears a good one, and is recorded in due time, and must estop Sanders and those claiming under him, from questioning it, as there is no circumstance of fraud proved as attending it.
The question next succeeds as to the effect of this deed’s being made when Sanders had no legal estate; for the grantors in the deed of M’Murtry to Sanders, both depose that they never executed it till the day of the acknowledgment, which is the 27th of June, 1815, instead of the2Sthof November, 1814, the date written on its face. It is insisted on the part of the defendants, that as this deed is acknowledged in due time byi the grantors and recorded; neither they nor any person claiming under them, can be allowed to disprove the date; while, on the other hand it is contended that it is competent to *434 prove that the deed was delivered on a different day from its date. As this deed is acknowledged as it stands, before the proper authority, the question whether a different date can be proved from that acknowledged, is somewhat different from the question whether a different day of delivery from that stated in the deed, can be proved. But we need not decide it now. For take it either way, precisely the •same consequences will follow in the present controversy. For if the deed is to be taken as of the date Written on its face, then the title of the trustees of -Ihe Insurance Company is unquestionable; because Sanders, possessing a legal estate, by deed recorded in due time, conveyed it to those trustees by deed properly recorded. Of course nothing was left for Sanders to convey to the Bank of Kentucky by his subsequent conveyance, and Morrison claiming under the first deed, took an indisputable estate. On the contrary, if the parol testimony is admitted, and the deed is to be held as a deed of the 27th of June, 1815, then, when Sanders conveyed to the Bank of Kentucky, udder whom the complainant claims, on the lóth’of June, 1815, there was the same absence of title in him then that there was when he conveyed to the Insurance Company, which placed their deeds on a par, -except .that the one to the Insurance Company was the eldest and recorded in proper .time. It has been often held by this court, that where a person conveys and warrants, and has no title, and afterwards acquires title, tiffs after-acquired title enures to the benefit of, and passes to hisalienee; see Massie vs. Sebastian, 4 Bibb 433; Aldridge vs. Kincaid, 2 Litt. Rep. 390. And in the case of .two conveyances by him when he had no title, we can have no hesitation in saying that the title enures to the benefit of, and passes to the first grantee, if he be a fair purchaser. According to this doctrine, when the M’Mur.tr-ies conveyed to Sanders, the trustees of the Insurance Company took the estate, and left nothing for the Bank of Kentucky, and Morrison claiming under the former deed, took the estate -mediately from it.
f)eed pf one holding the b0fore executod a deed, (ft °f s®0gne" person’sgrantee, apd his Sonfed, the land is not subject ^S^of^be debts of the mesne gran-,
*434 The remaining question on the title of the parties, is, what effect the sale and conveyance of this es *435 taíe to Haggin, under judgments and executions against Sanders took upon the estate. This sale was after both of the conveyances from Sanders, to the trustees of the Insurance Company, and that the Bank of Kentucky, and also subsequent to the-deed from the M’Murtries to Sanders, and before either the trustees of the Insurance Company or the Bank of Kentucky had disposed of their respective claims. In this situation we cannot decide that these judgments and executions could or did reach or pass the estate- in this thirty acres to Iiaggin. For although they could take and sell all the estate which Sanders held in the lands, and which he had not conveyed away by deed, recorded in due time; yet wc liave seen that his conveyance to the trustees of the Insurance Company was recorded! in. due time, although that to the Bank of Kentucky was not, and although this former deed,should be heldg according to the parol proof, to be made his having title, yet still as by the doctrines of the-common law, this subsequently acquired title enured; to the benefit of his previous grantee,, we cannot conceive that the legislature, in subjecting lands to the payment of debts, meant to disturb this wholesome provision of the. common law, and to subject such after acquired estates to seizure and sale, to the prejudice of the first grantee, by fair title of record; of course the title of the trustees of the Insurance. Company was not affected by this sheriff’s sale..
Trustee can-, an outstanding title to the property;but t0 ]„m his own right, rvill enure to t(J“ he Si hold.as trus-.-
Trustee who SiTanty'a1'* Gainst hfe grantor,'will bo estopped to assert claim to the property derived by purchaser, under an execution against his grantor.
*435 But if in this we-should be-mistaken, there is another reason why this sale by the sheriff could not operate to the prejudice of the trustees, of the Insurance Company. Haggin, w-ho-was the purchaser, under the execution, was also a trustee-of the Insu-. ranee Company, and was not permitted-- by. Iaw,.if. he had been so disposed, to do any thing to the pre-. judice of the cestui que trust, or to acquire titles to the trust estate, in his individual character, to the injury of the trust. "
If he did acquire such, they enured to the benefit of the trust. After making the purchase under the execution, he conveyed, jointly with his co-trustee, to Prentiss, under whom Morrison holds, by a deed *436 with warranty, against all claiming under. Sanders. This was sufficient to pass the estate acquired by executions, or to estop those claiming under him from asserting his title against the trust. Thus his title acquired by sheriffs sale, such as it was, passed to Morrison. It is true, he afterwards released his title by way of quit claim, to the Bank of Kentucky, to the whole estate acquired under the execution, including this thirty acres with the rest. But although tiiis was all done, and that without his know- • ing or suspecting that there was an interference between the two conveyances for the use of the two banks; yet the latter release could not pass the title to the bank of Kentucky, because of tlic prior deed as trustee of the Insurance Company, to Prentiss. The conclusion, therefore is, that Morrison held a complete title, and the complainant has no title, unless he has derived an eqidty against Morrison, arising from his acts in the arrangement with the Bank of Kentucky.
Principle— that he who stands by and sees his property sold without giving notice of his claim shall lose it, does not apply where such owner is ignorant of his claim to the thing.
It is almost certian, that Morrison, by his silence with regard to his own title during all the arrangement with the bank, and m providing for the sale of the estate, including these thirty acres, was guilty of no duplicity or actual fraud. The conveyance to the trustees of the Insurance Company, was of a tract of about 84 acres entirely confined to the north cast side of the road from Lexington to Georgetown. The conveyance to the Bank of Kentucky, was of a large estate of several tracts, and among others, a tract on the opposite side of said road, but it ran over, and included this thirty acres on Morrison’s side, out of 84 acres which he claimed, and it is not easy to ascertain from the conveyances, that there is any interference, by inspecting the face of them. It perhaps might be ascertained by plotting the notes of each, but it is not certain that it could without actual survey. Morrison was therefore ignorant of the interference at the time, as were all the parties, and did not know that he was putting some of his own land, then in his possession, into the compromise. It was not one of those claims that the parties stipulated to extinguish, and Morrison could have no motive to *437 conceal his claim, and jeopardize his title. Indeed, he had every motive to disclose his interest. For if if he lost his title by his silence, he would exactly, pay that amount more than his proportion one of the sureties of Sanders for which he could have no redress. Indeed, all the parties at that time appear to have been ignorant of the fact of this interference. The contract is silent respecting it. If it had been known it was the interest of all to provide against it. As to constructive notice, it could not operate upon Morrison. That notice, givén by the recording of conveyances, does bind a person to look for previous grants interfering with him, but not to examine subsequent ones, which could not be supposed dangerous. He had the oldest recorded conveyance, and might be told that Sanders who held adjoining lands had conveyed them to the Bank of Kentucky, and he might be shown the deed without being led to suspect that it interfered with the prior conveyance, and if he read the deed, he might not be able to perceive it. Constructive notice, therefore, operated not against, but in favor of Morrison. He held the oldest conveyance, and the possession, of which the bank when making this arrangement, was bound to notice. As he was not bound to know of this interference, and did not in fact know of it, as is evinced from the circumstances of the case, the question turns upon the effect that this ignorance ought to have in his favor. The principle that one who stands by and sees another spend his money, and induces him to do so, for property to which he has a claim, shall not be permitted to assert that claim thereafter, or shall be compelled to surrender it in favor of the deluded purchaser, we grant is a strong one, frequently enforced by upright chancellors, and often by this court. But the punishment of fraud is the foundation of the rule, and that not constructive or legal, but actual fraud. The quo animo must be enquired after. In short, the silence, or acts done by such a bystander, which deludes the purchaser, must be of a culpable character, and such as leads the chancellor to reach and charge the conscience of the offender. And unless this can be *438 done, we know of no case where the chancellor has enforced the principle. Here, then,- is Morrison deceived, mistaken and ignorant when he entered into this arrangement, and the purchaser under the arrangement, who complains that he has been deceived by those acts of Morrison, when he did not intend it. Which of the two shall lose, the party who has a valid title, or he that bought an invalid claim? Equity will permit him who has the title and possession to keep them still.
Held that Morrison was not estopped by his arrangement with the bank to assert his claim to the land before the sale; the parties having been all ignorant of the interference-.
But we cannot say that the complainant here, does stand on equal grounds, in this respect, with Morrison, who disclosed his claim at the sale, and forewarned him of his danger, before he had ex pended one cent of his money. He hesitated, and heard the opinions of others, who condemned Morrison’s title, and it is clear he rested on them, and run the risque, and did not rely on any obligations to convey the title, which Morrison may have been supposed to have come under, by his unsuspicious, and innocent silence, in his arrangements with the bank. Relying on this is evidently an after thought, found out and set up long after filing his original bill. It has been urged that this forbiding of the sale by Morrison came too late, and that he was not at that hour at liberty to retract, after he had brought the bank into the arrangement, and purchasers at this sale had a right to claim the rights of the bank. This might be true, if he had knowingly, or intentionally deceived the bank previously. But this we have seen he did not do. We do not perceive how the bank can complain. She had no title to this land before the arrangement, and she therefore lost nothing. Nor do we see how the collateral sureties of Sanders, as has been urged in argument, are injured or defrauded by this act of Morrison. If the complainant does not gain this land, these sureties will have the precise sum to pay in the deficit, which they would have had, if Morrison had disclosed and excepted his title in making this arrangement, and not one cent more. On the contrary, if Morrison should lose, he would pay the value of this land more than the rest.
Purchaser of vendor to the whole tract, a'n sary ciaim to part, not askhavecompensaüon for the Part losb but {ds ulation.
Purchaser of the bank without the corporate a proper deed, because he paredfa deed, ^a(1 aeGverane^ fused to put hei sea1'
Crittenden, Chinn, and Wickliffe, for appellants; JIaggin and Loughborough, for appellee.
Besides, it is necessary to first ascertain whether the complainant is entitled to an abatement with the Back of Kentucky, for the price of i* is thirty acres, so as to charge the securities with it, they cancomplain. This forms the remaining ques- .• £ 1 llon'
It is clear, that the bank did not agree to warrant the title. Their advertisement did not promise a warranty, but only the title conveyed to them by Sanders, and it is in proof that their terms of sale was read on the day of sale, before the sale of every particular piece of property, explicitly announcing that they parted with their title only. The bargain of the complainant was therefore a risquing one. In the same purchase, he got other lands in which there is no dispute, and which may probably be worth all he gave for the whole, and it is worthy of remark, that he not only run the risque of Morrison’s title, when warned of it before he bought; but since, in his ball he has said nothing about a rescission of contract. He still claims to retain the undisputed part. As against the bank, therefore, he is entitled to no redress by the abatement of the purchase money.
It is true his deed is not, as it ought to be, under the seal of the corporation. For the agent, instead of affixing the corporate seal of the institution, has only affixed his own seal. But as he has accepted this conveyance, and has not prepared another, and applied to the bank to execute it properly, which the bank expresses a willingness to do, it will be time enough to grant him redress when they refuse.
The decree must, therefore, be reversed with costs, and the cause be remanded with directions to the court below to dismiss the bill with cost.